IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

ANDREW MAINES and
KENNETH MAINES,

      Appellants,

v.

MARCIA DRASKO FOX,

      Appellee.

_____/

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NOS. 1D14-5917, 1D15-0739

Opinion filed May 3, 2016.

An appeal from the Circuit Court for Okaloosa County.
John T. Brown, Judge.

Caryn L. Bellus and Bretton C. Albrecht of Kubicki Draper, P.A., Miami, for
Appellants.

C. Paul Brannon and W. Dennis Brannon of Brannon & Brannon, Ft. Walton
Beach, and Charles F. Beall, Jr. of Moore, Hill & Westmoreland, P.A., Pensacola,
for Appellee.

WOLF, J.

      Appellants, defendants in the trial court, challenge a final judgment in a case

which arose out of a motor vehicle accident for which liability was admitted, and

the major point of contention was whether the accident caused appellee's injury.

Appellants assert that the trial court erred in 1) admitting testimony regarding why

appellant Andrew Maines ran the red light, causing the accident; 2) improperly limiting the testimony of appellants' expert concerning the specific causation of appellee's injury; and 3) awarding attorney's fees based on the rejections of appellee's October 8, 2013, proposals for settlement.

We find no error in allowing testimony concerning why appellant Andrew Maines ran the red light because under the circumstances of the case, the testimony was pertinent to Andrew's speed, which was relevant to whether the accident caused appellee's injury. We, therefore, affirm as to this issue without further comment.

As to the expert testimony, we determine the trial court abused its discretion in refusing to allow the expert biomechanical engineer, who was also an expert medical doctor, to render an opinion as to the specific causation of appellee's injury but find the error was harmless, because the expert was allowed through other testimony to convey substantial portions of his opinion to the jury.

As to the attorney's fees issue, we determine the offers of settlement were internally inconsistent and ambiguous, so the trial court erred in awarding attorney's fees based on appellants' rejections of the offers.

## I. General Facts

This case arose out of an automobile accident that occurred when appellant Andrew Maines ran a red light and hit two cars, one a vehicle driven by appellee,

2

Marcia Fox. Appellee filed suit, claiming Andrew Maines was negligent in causing the accident and that his father, Kenneth Maines, was vicariously liable as the vehicle owner. Appellee claimed she was permanently injured and required neck surgery as a result of the accident. Appellants admitted liability but denied the accident caused appellee's injury. Both sides presented expert testimony concerning the causation of the injury and need for surgery, which will be more fully described later on in this opinion.

The jury returned a verdict finding appellee suffered a permanent injury and awarded her a total of $143,896.32. Appellee moved for an award of attorney's fees pursuant to section 768.79, Florida Statutes (2013), based on wrongful rejection of her previously filed settlement proposals. The trial court granted the motion.

## II. Testimony of Expert Witnesses

Both sides presented expert testimony as to the cause of appellee's injury. Appellee presented the testimony of her treating chiropractor, Dr. Kelly-Dukes. Dr. Poelstra, who performed neck surgery on appellee, also testified. Both doctors opined the automobile accident was the cause of appellee's injury.

Notably, Dr. Poelstra explained to the jury that he had extensive expertise not only as an orthopedic surgeon but also as a biomedical engineer with specialized knowledge regarding the effect of external forces on the human spine.

3

He opined that appellee suffered a permanent neck injury, a disc herniation, as a result of a traumatic event (meaning the accident), which caused her need for neck surgery and which would likely require a second surgery in the future. He further testified that such an injury could be caused by a minimal amount of external force or trauma.

He explained that because there is always a delay between the movement of a person's body and her head, a low-speed collision can cause a significant injury, "because the simple mass times a little bit of velocity, if it's only even five miles an hour is a tremendous force on the human body." Although he later admitted that he did not analyze the forces in this accident, he further opined that even a five-mile-per-hour impact "can have a tremendous impact on the human body, simply because we're small, the car is big, so the kinetic energy on the body is huge."

Appellants presented two expert witnesses, Dr. Keller, a medical doctor, and Dr. Bowles, a biomechanical engineer and medical doctor.

Dr. Keller testified that he did not believe the motor vehicle accident caused appellee's cervical injury; rather, he believed appellee's preexisting condition of degenerative disc disease was the cause. Dr. Keller relied on appellee's medical records as well as her account of the accident in formulating an opinion.

Dr. Bowles, a biomechanical engineer and medical doctor, planned to offer expert causation testimony in part based on a force analysis that he conducted

4

using his expertise as both a biomechanical engineer and a medical doctor. His opinion was that the forces at play in the accident were too minimal to cause the specific injury suffered by appellee.

Appellee presented a challenge to the reliability of Dr. Bowles' planned causation testimony pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), alleging that Dr. Bowles' method of using his force analysis results to come to specific medical causation conclusions was not reliable because medical doctors, when determining causation, do not normally rely on force analyses. Appellee alleged that by using his biomechanical background to testify as to specific medical causation, Dr. Bowles was creating a new type of expertise that had not been deemed reliable by the scientific community.

After holding a hearing on the Daubert challenge, the trial court found that Dr. Bowles improperly "bridged" the fields of biomechanical engineering and medicine by relying on his own force analysis to determine appellee's injury was not caused by the accident without proving the reliability of using force analysis calculations to determine specific causation. The trial court thus limited Dr. Bowles' testimony, preventing him from testifying as to his opinions regarding specific causation of this particular injury; the court, however, permitted Dr. Bowles to testify regarding his force calculations of the accident and his belief that

5

the forces in effect during this particular accident would not have been severe enough generally to cause the injury alleged by appellee.

It is important to analyze specifically what testimony Dr. Bowles was allowed to present to the jury without objection and what was excluded. Specifically, Dr. Bowles informed the jury that part of his job as a biomechanical engineer and accident reconstructionist was to determine what specific forces were at work on the human body during an accident:

> A: [A]ccident reconstruction [ ] is applying the collision physics to understand – looking at vehicles and roadways and diagrams and putting together how vehicles collide and understanding the physics behind that and then understanding things like the forces and the nature of movement that are caused by vehicles that collide.
> Q: And is part of what you do examine the forces that are exerted on the human body during an automobile accident?
> A: Yes.

Dr. Bowles also testified that he was "prepared today to discuss the forces that would have been applied *to a person in [appellee's] vehicle at the time of the accident*." (Emphasis added).

Dr. Bowles also informed the jury of the specific forces at work in the accident and how those forces affected appellee's vehicle. Dr. Bowles testified that appellee's vehicle was hit by appellant Kenneth Maines' vehicle "with a force

6

level that's between about seven thousand and thirteen thousand pounds." He then

specified how that force level would affect an occupant of appellee's vehicle:

> Q: In an Infiniti such as the one that Ms. Fox was driving, how would that force affect an occupant of the cabin?
>
> A: Well, the occupant moves as a result of the vehicle moving out from under them. So at that level, that force applied in an impact would cause the vehicle to slide over the road and move up to a speed of three point one miles per hour as a result of that type of impact. And it would do that over about one hundred milliseconds . . . over that length of time, that amount of movement would accelerate the vehicle by an acceleration rate of about two point three Gs, and that's an acceleration measure, in other words, how abruptly the speed changes.

Dr. Bowles next informed the jurors that a speed change rate of 2.3 Gs was

miniscule, a force amount comparable to the forces people normally encounter

doing day-to-day activities:

> So when you corner a vehicle or when you step on the brake at a stoplight, you're usually seeing about point seven G. And then if you go over railroad tracks or if you ride public transportation where you're standing up and holding on to a pole and it – and the vehicle changes direction, the occupant or the person riding in the vehicle will experience an acceleration that's in this range, two-and-a-half Gs is not unusual. If you pay money to go to Six Flags or Disney, roller coasters will put [sic] about three-and-a-half Gs.

7

The jurors were also informed of the minimum force level required to cause a cervical disc injury like the one suffered by appellee, and that the minimum force level was "substantially higher energy than what we're talking about here":

> Well, in order to cause the disc injury, you have to push on it hard enough that you cause anatomical damage . . . it usually takes a vertical drop. So an acceleration as in the range of about twelve Gs for the disc to begin to structurally fail or you have to have some sort of movement that is in a direction that pulls the head and the neck in a way that's different than the shoulders and the torso. And that ends up with lateral accelerations that can be in the six to eight Gs to start that process.

Finally, the jurors learned that Dr. Bowles believed only an extraordinarily fragile person would suffer a cervical disc injury at the force level caused by the accident:

> Well, this level, again, is well within what you would experience in an ordinary day of travels across a railroad tracks, potholes and those sorts of things. Your head and neck will see accelerations that are in this level – in this range. And so, again, are there people who are so fragile that they could become symptomatic simply riding around in a car? There are some people that are that fragile. So I think that the bell curve of human experience, there might be some very, very fragile people out there so some people might be susceptible.

Thus, Dr. Bowles was able to testify as to five key facts: (1) the point of his biomechanical engineering analysis was to determine what forces would have impacted a person in appellee's vehicle at the time of the accident; (2) the specific acceleration rate of 2.3 Gs was applied to appellee's vehicle as a result of the

8

accident; (3) the miniscule amount of force that 2.3 Gs would cause was roughly equivalent to riding public transportation or driving over railroad tracks; (4) significantly higher forces than the ones at work in the accident were necessary to cause resulting cervical disc injury; and (5) only an extremely fragile human being could have sustained an injury similar to that allegedly sustained by appellee as a result of the accident.

The only testimony excluded was that the forces from this particular accident could not have caused the injury to this specific plaintiff.

## III. Daubert Analysis

A trial court's exclusion of expert testimony is reviewed for an abuse of discretion. Baan v. Columbia County, 180 So. 3d 1127 (Fla. 1st DCA 2015). In the instant case, the expert's opinion was challenged pursuant to Daubert, 509 U.S. 579. The Daubert standard for admissibility was adopted by the Legislature in section 90.702, Florida Statutes (2014).[*] See Giaimo v. Fla. Autosport, Inc. 154 So. 3d 385, 387-88 (Fla. 1st DCA 2014). That section provides that expert witness opinion testimony is admissible if:

(1) The testimony is based upon sufficient facts or data;

(2) The testimony is the product of reliable principles and methods; and

---

[*] The constitutionality of this statute is not at issue in this appeal.

9

(3) The witness has applied the principles and methods reliably to the facts of the case.

Under Daubert, a trial court exercises a gatekeeping function to "ensure that any and all scientific evidence is not only relevant, but reliable." Daubert, 509 U.S. at 589. In doing so, the trial court may look at both underlying scientific reliability and whether "'there is simply too great an analytical gap' between the underlying science and the expert's opinion." C. Ehrhardt, Florida Evidence § 702.3 (2015 ed.) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). Where evidence is based on reliable principles and methods and is reliably applied to the facts of the case, the trial court errs in excluding such evidence. Baan, 180 So. 3d at 1134.

Here, it was undisputed that the underlying biomechanical calculations of Dr. Bowles were reliable. It was also undisputed and unobjected to that Dr. Bowles, as a biomechanical engineer, could testify that the forces involved in the accident would not generally cause the type of injury suffered by appellee. Further, Dr. Bowles was also an expert medical doctor who could presumably have given an opinion, as the other doctors did, based on medical records and patient history, as to whether this accident caused the specific injury in question.

In analyzing whether Dr. Bowles could have also relied on his force calculations to give his specific causation opinion, it may be helpful to view what

10

biomechanical engineers and doctors are normally allowed to testify to in addition to any limitations and reasons why.

It is undisputed that biomechanical opinions as to the general causation of a type of injury are admissible. In <u>Council v. State</u>, 98 So. 3d 115, 116 (Fla. 1st DCA 2012), we specifically recognized that a biomechanical expert is qualified to opine on the general mechanism of an injury. In <u>Houghton v. Bond</u>, 680 So. 2d 514, 521 (Fla. 1st DCA 1996), we accepted similar testimony. <u>See also</u> <u>Zane v. Coastal Unilube, Inc.</u>, 774 So. 2d 761 (Fla. 4th DCA 2000).

Biomechanical experts are not, however, allowed to render opinions that require medical expertise. For instance, in <u>Mattek v. White</u>, 695 So. 2d 942 (Fla. 4th DCA 1997), the court held an accident reconstructionist could not testify as to the permanency of an injury. <u>See also</u> <u>Stockwell v. Drake</u>, 901 So. 2d 974 (Fla. 4th DCA 2005) (holding a biomechanical engineer could not testify as to specific causation or extent of injury). Issues such as permanency and severity of an injury require medical evaluation of the patient, the patient's history, and the particulars related to a specific person which go beyond the typical expertise of a biomechanical engineer. Dr. Bowles admitted as much in his testimony when stating that force projections *alone* would not support an expert opinion as to specific causation.

We do, however, allow medical experts to give opinions as to specific causation, as noted by appellee's counsel during the Daubert hearing:

> He's a hybrid. He has the education, training, experience as a biomechanical engineer, and he's also a medical doctor, board-certified surgeon with spinal surgery. And what we're saying is we have no objection to him offering testimony regarding the general forces that the general public or the plaintiff would have experienced. But when you go over to what injuries were, in fact, caused in the accident, you're sliding into the medical arena. And this is when Dr. Bowles can use his expertise, his qualifications, his experience as a medical doctor to say, I've reviewed the medical records, and I believe that these injuries were or were not caused in the motor vehicle accident. But when a medical doctor relies upon an accident reconstruction and a force analysis to come to a conclusion that these injuries weren't caused in the motor vehicle accident, you're creating a whole new brand of expert specialty, a new science.

(Emphasis added).

It is also not unusual for doctors to rely on anecdotal evidence of the history and severity of an accident in rendering a causation opinion. As noted by Dr. Keller, appellants' second expert witness, medical doctors often rely on a patient's account of the underlying incident to formulate their opinions as to specific injury causation: "[Orthopedic surgeons] take into account the mechanism of injury in assessing a patient's injury . . . . I would typically ask if the airbags deployed, how much damage was done to the car, if they're in a car."

Dr. Bowles' consideration of specifically calculated biomechanical force analysis factors, the underlying methodology of which was not challenged by appellee, was simply a more accurate measure of the factors already considered by doctors to render causation opinions.

Because appellee did not challenge the underlying scientific methods used by Dr. Bowles in conducting his biomechanical force analysis, and because Dr. Bowles' reliance on that unchallenged force analysis was simply a more accurate measure of factors normally relied upon by medical doctors to determine specific causation, we find the trial court's limitation of Dr. Bowles' testimony was an abuse of discretion. However, we find that the limitation of the testimony was harmless error.

## IV. Harmless Error

In civil cases, any error is harmful "[u]nless the beneficiary of the error proves that there is no reasonable possibility that the error contributed to the verdict." Special v. W. Boca Med. Ctr., 160 So. 3d 1251, 1256-57 (Fla. 2014).

Here, we find appellee successfully proved there was no reasonable possibility that the trial court's limitation of Dr. Bowles' testimony contributed to the jury's verdict for two reasons: (1) despite the limitation of testimony, the jury was nonetheless presented with all of the relevant facts; and (2) the admitted

13

testimony of Dr. Bowles sufficiently portrayed to the jury his opinions as to causation.

As previously noted, Dr. Bowles testified as to all of his force calculations and the methodology utilized in determining the G-force exerted on the vehicle. He was also able to explain in detail how such force related to forces our bodies encounter in everyday life. Thus, the jury was presented with all of the relevant facts, including the minimal forces at work in the accident which Dr. Bowles believed were unlikely to cause injury to a person unless she was extremely fragile, as well as Dr. Keller's opinion that the accident did not cause appellee's injury.

Dr. Bowles' proffer offered very little additional evidence that he had not covered in his admitted testimony. In Dr. Bowles' proffer, he discussed many of the factors about which he was actually able to testify, including the fact that, as a biomechanical engineer, he "had to have an understanding of the collision event itself and how the vehicle moved, as well as correlate that with the patterns of injuries that [appellee] had," and his belief that knowing the force of an accident "leads you to an idea of the relative risk" of a person potentially sustaining injuries; however, "it doesn't tell you whether somebody is really lucky and gets off scott-free [sic] or whether or not they were a fragile egg who was unfortunately injured by something that would not have caused injury to the majority of people."

14

Had Dr. Bowles' testimony not been improperly limited, the only additional information he would have testified to, as noted in his proffer, would have been his specific causation opinion: "It's my opinion that [appellee] did not suffer an acute traumatic injury as a result of the impact"; however, she did suffer non-permanent muscle strain as "the result of her seeing the vehicle come, bracing, and then whatever movement happens in her vehicle."

Thus, despite the limitation of his testimony, because Dr. Bowles was able to present to the jury all relevant factors he deduced from his force analysis calculations and to opine that only an extremely fragile person could have sustained an injury like appellee's from the motor vehicle accident, we find the erroneous limitation of Dr. Bowles' testimony could not reasonably have contributed to the jury's verdict. As such, we find the trial court's error was harmless and affirm the judgment as to liability and damages.

V. Attorney's Fees Based on Proposals for Settlement

Appellants challenge the trial court's award of attorney's fees to appellee based on appellee's October 2013 proposals for settlement, to which appellants never responded. Appellants allege, among other things, that the award of attorney's fees should not have been given to appellee because the proposals for settlement contained improper ambiguities. We agree.

15

A trial court's ruling on a motion to tax attorney's fees and costs pursuant to the offer of judgment statute is reviewed de novo. See Paduru v. Klinkenberg, 157 So. 3d 314, 316 (Fla. 1st DCA 2014).

Section 768.79 and Florida Rule of Civil Procedure 1.442 govern the form and content of proposals for settlement. Strict adherence to section 768.79 and rule 1.442 is required of proposals for settlement. Borden Dairy Co. v. Kuhajda, 171 So. 3d 242, 243 (Fla. 1st DCA 2015). The rule of strict compliance is a bright-line rule. Colvin v. Clements & Ashmore, P.A., 182 So. 3d 924 (Fla. 1st DCA 2016).

Both section 768.79 and rule 1.442 require that certain elements of proposals for settlement be stated with particularity. For example, rule 1.442(c)(2) specifically requires "any relevant conditions" and "all nonmonetary terms of the proposal" to be stated with particularity; rule 1.442 also requires proposals for settlement to "state whether the proposal includes attorneys' fees and whether attorneys' fees are part of the legal claim." Fla. R. Civ. P. 1.442(c)(2)(C), (D), (F).

When considering what degree of particularity the rule requires, the supreme court has held that "'[t]he rule intends for a proposal for judgment to be as specific as possible, leaving no ambiguities so that the recipient can fully evaluate its terms and conditions.'" State Farm Mut. Auto. Ins. Co. v. Nichols, 932 So. 2d 1067, 1079 (Fla. 2006) (quoting Lucas v. Calhoun, 813 So. 2d 971, 973 (Fla. 2d DCA 2002)). Though elimination of *all* ambiguity might be impossible, a proposal must

16

nonetheless "be sufficiently clear and definite to allow the offeree to make an informed decision without needing clarification. If ambiguity within the proposal could reasonably affect the offeree's decision, the proposal will not satisfy the particularity requirement." Id.; see also Audiffred v. Arnold, 161 So. 3d 1274, 1279 (Fla. 2015).

Here, we find the October 8, 2013, proposals for settlement contained patent ambiguities which could reasonably have affected appellants' decisions not to accept them; the proposals were ambiguous as to whether they were inclusive of attorney's fees and costs.

Paragraph 4 of the proposals provided that no attorney's fees or costs would be taxed against appellants. However, Paragraphs 10 and 11 contradicted Paragraph 4. Paragraph 10 implied that attorney's fees could be taxed against appellants at a later time, despite the statement in Paragraph 4 that no attorney's fees would be taxed against appellants: "Attorney fees at this time are not part of any claim being asserted by Plaintiff and, therefore, this Proposal does not include any claim for attorney fees."

Further, Paragraph 11 contradicted the claim in Paragraph 4 that no costs would be taxed against appellants by stating, "This Proposal is inclusive of costs." There was no mention that the proposals were inclusive of attorney's fees.

We find these ambiguities regarding attorney's fees and costs left appellants unable to fully evaluate the proposals' terms and conditions. Further, the ambiguities prevented the proposals from strictly comporting with the requirements of rule 1.442 that proposals for settlement "state whether the proposal includes attorneys' fees and whether attorneys' fees are part of the legal claim" and "state with particularity any relevant conditions."

Because of their patent ambiguities as to attorney's fees and costs, we find the October 2013 proposals for settlement invalid and therefore vacate attorney's fees based on those proposals awarded by the trial court; however, we vacate without prejudice for the trial court to evaluate any other proposals for settlement that were presented to appellants by appellee.

AFFIRMED, but the award of attorney's fees is VACATED.

ROWE and RAY, JJ., CONCUR.