MEGAN E. BAAN, as the Personal
Representative of the Estate of
CHARLES CRAVEN MCALPIN,
deceased,

      Appellant,

v.

COLUMBIA COUNTY,

      Appellee.

_____/

IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D15-0092

Opinion filed December 8, 2015.

An appeal from the Circuit Court for Columbia County.
Paul S. Bryan, Judge.

Gilbert J. Alba of the Law Office of Alba & Yochim, P.A., Gainesville, for
Appellant.

Jesse F. Suber, E. Victoria Penny, and Miriam R. Coles of Henry Buchanan, P.A.,
Tallahassee, for Appellee.

BENTON, J.

      On appeal from final summary judgment, the parties focus on an antecedent

order granting a motion to exclude the testimony of appellant's expert witness.

The expert testified on deposition as to, among other things, the standard of care when emergency personnel respond to a 911 call seeking help for an infant reported to be struggling to breathe. Columbia County concedes that, if exclusion of the expert testimony was error, entry of summary judgment was also error. Concluding the expert testimony should have been considered in deciding the motion for summary judgment, we reverse and remand for further proceedings.

On November 17, 2007, Columbia County Emergency Medical Services (EMS) responded to a 911 call reporting a child was in respiratory distress. Arriving on the scene, EMS personnel found Charles Craven McAlpin (Craven), an 11-month-old who had been left in the care of Allison McAlpin, his aunt. The parties agree that the EMS personnel left the scene within 10 minutes of arriving, after showing Allison McAlpin how to use a nebulizer.

In a 2014 affidavit and again on deposition in 2014, Dorothy Benoit, a neighbor to whom Ms. McAlpin had taken Craven because of his difficulty breathing, maintained she held the child over her shoulder during the entire time EMS personnel were on the scene during their first visit, and that the first responders who arrived on the initial run "did not conduct any examination of him and in fact did not even touch Craven."[1]

---

[1] Ms. Benoit recalled the events somewhat differently in an earlier recorded statement in 2007, in which she acknowledged that a first responder had held a stethoscope to the child's back while she was holding him.

2

On the other hand, an EMS report said Craven was examined and found to have normal vital signs: a pulse of 120, a respiratory rate of 20, and oxygen saturation of 98 percent. The same report indicated EMS personnel were told the child had earlier been diagnosed with asthma, and concluded he might have been suffering an asthma attack before EMS arrived. Finally, the EMS report said that the child had throat congestion he cleared upon coughing, and that his lungs sounded clear. Approximately 50 minutes after EMS personnel left, another 911 call brought news that the child was not breathing at all. This time a different neighbor, Carl Billings, a trained emergency medical technician whom the aunt summoned to help when he came home, "found Craven lying on the floor face up with his face turning blue." Mr. Billings instructed Ms. McAlpin to call 911, before he "immediately began administering CPR." He stated in an affidavit (and testified to the same effect on deposition) that he first turned the child over "to allow the copious amounts of mucus and fluid to drain from his mouth and nose."

When EMS arrived in response to the second 911 call, one EMS employee testified, the child was "blue," "extremely clammy," and "cool to touch." EMS personnel immediately used equipment they had on the ambulance to clear his airway by suctioning, started ventilating with a "bag valve mask," and intubated him. But they never detected the child's pulse on the second run, and soon transported him to a local hospital. After being airlifted to Shands Hospital in

3

Gainesville, where he was placed on a mechanical ventilator, Craven was pronounced dead there the next day.

Dr. David Tulsiak, an emergency room physician retained as an expert by the child's mother, executed an affidavit in 2010 in which he offered two highly relevant opinions.[2] First, he concluded EMS breached the prevailing professional standard of care by failing to put the child in the ambulance (which was equipped with oxygen) on their first run and take him to the hospital for evaluation and treatment. Dr. Tulsiak also concluded that "had the prevailing professional standard of care been met by Columbia County EMS, more likely than not, Charles C. McAlpin would have been treated for a lack of oxygen and he would have survived."

In his deposition taken four years later, Dr. Tulsiak said much the same thing, stating he had reviewed all the material appellant provided him in 2010 in forming his opinion at that time.[3] Consistently with his affidavit, Dr. Tulsiak

_____

[2] In addition, he also expressed an opinion as to the cause of death, concluding it was an airway obstruction attributable to mucus and bronchospasm. The autopsy revealed the child had pneumonia but this could have been contracted at Shands on the ventilator. EMS filed a deposition excerpt suggesting it had an expert who would testify that traumatic brain injury caused the child's death. The medical examiner said the cause of the child's death could not be determined. She could not rule out asthma, among other things. She testified, "I think a lot of people would hang onto the bronchopneumonia." See also note 5, infra. The trial court expressly declined to decide the cause of death.

[3] Although Dr. Tulsiak did not specifically mention Ms. Benoit's 2007 recorded statement, he did say he reviewed it when appellee's counsel asked him

testified that the most critical breach of the standard of care was EMS's failure to "transport th[e] patient to a medical facility for further definitive care" after responding to the first 911 call. Dr. Tulsiak pointed out that EMS violated its own protocol for "Respiratory Distress." EMS's protocol called for maintenance of the airway, continuous assessment of breathing and circulation, application of oxygen, and "[t]ransport ASAP."[4]

Dr. Tulsiak concluded the child's respiratory condition had deteriorated—after EMS failed to transport him—until his airway was obstructed by mucus, congestion, and "[m]ore likely than not" bronchospasm, that is, "narrowing of the airways from smooth muscle constriction." Although he conceded that something like "a peanut in his upper airway" or severe blunt force trauma to the head could theoretically cause respiratory arrest, Dr. Tulsiak stated there was no physical evidence of either[5] and that it "would not be consistent with [the child's] presentation on either the first or the second run."

---

whether he saw one of the "witness statements" that "said [EMS] did check [the child] with a stethoscope twice?"

[4] Dr. Tulsiak agreed the requirement to implement the Respiratory Distress protocol presupposed a patient experiencing respiratory distress, but he asserted EMS should have been operating under the protocol given that the subject of the first 911 call was a child in respiratory distress.

[5] Separately, the medical examiner testified subdural hemorrhages discovered in the child's autopsy "were insignificant given the age of the child and the small nature of the subdurals." She unequivocally concluded: "I do not believe the subdural hematomas contributed to his death."

5

Even assuming EMS recorded the child's vital signs accurately,[6] Dr. Tulsiak testified, a more detailed assessment of the child should have been performed; to that end, EMS should have spent more time observing the child, and should have taken him to a hospital to be examined by a physician. Since the child was reported in respiratory distress when the first 911 call was placed, he required transport to a hospital, according to Dr. Tulsiak, given the historical diagnosis of asthma[7] and considering an 11-month-old child's inability to "verbalize [his] need for help."

Some months after Dr. Tulsiak's deposition, EMS moved to exclude his expert testimony, arguing primarily that his testimony was insufficiently reliable under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), because

---

[6] Although Dr. Tulsiak did not "question that there was an evaluation done" by EMS after the first 911 call, he believed the vital signs documented on the EMS report were likely inaccurate. For example, Dr. Tulsiak questioned the respiratory rate of 20 "[b]ecause we factually know that the child had a respiratory arrest approximately an hour later, if not sooner. And that respiratory rate of 20 seemed inconsistent with a child imminent of a respiratory arrest within an hour." At the same time, Dr. Tulsiak conceded that it was possible for a person to have a respiratory rate of 20 and then experience respiratory arrest within the hour. In addition, Dr. Tulsiak doubted the child's lung sounds were clear, as reported by EMS, partly because the EMS report also noted the child had throat congestion.

[7] The parties do not dispute the medical examiner's findings on autopsy that a diagnosis of asthma could not be made histologically. The historical diagnosis of asthma indicated to Dr. Tulsiak that Craven had a history of respiratory problems, whether or not the diagnosis was accurate. Dr. Tulsiak relied on the evidence of bronchopneumonia and congestion found on autopsy, the child's (perhaps mistaken) diagnosis of asthma, his clinical presentation, and his ultimate respiratory arrest to support his opinion that Craven had hyperactive airway disease.

6

"[a]ll of Dr. Tulsiak's opinions . . . [we]re rooted in one assumption: that because [the child] experienced a respiratory arrest within one hour of [i.e., after] the first EMS call, he must have been experiencing a detectable respiratory problem at the time of that first call." (This overlooks, of course, the fact that the aunt and the neighbor both actually observed the "detectable respiratory problem" that led to the first call, and so informed EMS personnel upon their arrival.)

Following a hearing on EMS's motion, the trial court concluded that Dr. Tulsiak had rejected evidence he should have accepted as true (the EMS report) and that "the only evidence as to the child's true respiratory status was recorded by the paramedics," so that Dr. Tulsiak's opinions were "premised on speculation based on an ultimate injury and manufactured facts." On this rationale, the trial court ruled Dr. Tulsiak's testimony inadmissible under Daubert and granted EMS's motion to exclude his testimony. Shortly thereafter, EMS moved for summary judgment on grounds there was no evidence of any negligence without Dr. Tulsiak's testimony, and appellant filed a motion for reconsideration of the trial court's evidentiary ruling. After the trial court denied the motion for reconsideration and granted final summary judgment in favor of EMS, the present appeal ensued.

A trial court's exclusion of expert testimony is reviewed for an abuse of discretion. See Booker v. Sumter Cty. Sheriff's Office/N. Am. Risk Servs., 166

7

So. 3d 189, 194 n.2 (Fla. 1st DCA 2015) (citing <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 142 (1999)); <u>see also</u> <u>Adams v. Lab. Corp. of Am.</u>, 760 F. 3d 1322, 1327 (11th Cir. 2014) ("Even where a ruling excluding expert testimony is 'outcome determinative' and the basis for a grant of summary judgment, our review is not more searching than it would otherwise be."). The proponent of expert testimony must, when properly challenged, establish the basis for its admissibility by a preponderance of the evidence. <u>See</u> <u>Booker</u>, 166 So. 3d at 193 n.1 (citing <u>Daubert</u>, 509 U.S. at 592 n.10).

In forming opinions, an expert is entitled to rely on any view of disputed facts the evidence will support. <u>See</u> Fed. R. Evid. 702 advisory committee's note ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."). Drawing all factual inferences in favor of appellant (the non-movant), the record—in particular Ms. Benoit's deposition testimony—provides adequate support for Dr. Tulsiak's opinion that, when EMS responded to the first 911 call, it did not perform an adequate evaluation of the child. The trial court made a factual determination that should have been left to the jury in deeming the EMS report accurate, contrary evidence notwithstanding.

8

Ms. Benoit testified that she observed the child's difficulty breathing prior to the first EMS visit, and Mr. Billings testified that the child was not breathing and had "copious amounts of mucus and fluid" coming from his mouth and nose prior to the second EMS visit. Their testimony, together with the child's history of breathing problems (thought to be asthma) and the undisputed fact the child stopped breathing altogether within minutes of EMS's initial departure, all support Dr. Tulsiak's opinions the child should have been taken to the hospital and would have survived but for EMS's failure to transport him.

Under Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), expert opinion testimony is admissible if the expert is qualified and the opinion falls within the witness's expertise. See Marsh v. Valyou, 977 So. 2d 543, 548–49 (Fla. 2007) ("'While cloaked with the credibility of the expert, [pure opinion] testimony is analyzed by the jury as it analyzes any other personal opinion or factual testimony by a witness.'" (citation omitted)); see also Booker, 166 So. 3d at 193 ("'Pure opinion testimony' is testimony based only on the personal experience and training of the expert.").

Columbia County does not dispute that Dr. Tulsiak was, based on his training and experience, well qualified as an expert in emergency medical care. There is little question that his testimony would be admissible under Frye: Dr. Tulsiak testified he had been board certified in emergency medicine for

9

approximately 30 years and had served as an emergency medical service medical advisor for over 25 years at two EMS departments in Florida. He said he dedicated 98 or 99 percent of his time to active clinical (emergency) practice and worked regularly at two Florida hospitals. In his 30 years of practicing emergency medicine, Dr. Tulsiak said he treated numerous children with a range of respiratory problems, including among other things: asthma, hyperactive airway disease, bronchiolitis, congestion, pneumonia, and upper respiratory tract infections with bronchospasm.

But the Legislature has adopted[8] the <u>Daubert</u> standard for the admissibility of expert testimony. See <u>Giaimo v. Fla. Autosport, Inc.</u>, 154 So. 3d 385, 387–88 (Fla. 1st DCA 2014). As amended, section 90.702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;

---

[8] Appellant does not argue that chapter 13-107, section 1, Laws of Florida, in amending section 90.702, Florida Statutes (2014), effected a change in procedure that must be adopted by the Florida Supreme Court. See Art. V, § 2(a), Fla. Const. At least where, as in the present case, the constitutional issue is not raised, First District precedent teaches "'that the <u>Daubert</u> standard [is] applicable to all expert testimony.'" <u>Giaimo v. Fla. Autosport, Inc.</u>, 154 So. 3d 385, 388 (Fla. 1st DCA 2014) (quoting Charles W. Ehrhardt, 1 Fla. Prac., <u>Florida Evidence</u> § 702.3 (2014 ed.)).

(2) The testimony is the product of reliable principles and methods; and

(3) The witness has applied the principles and methods reliably to the facts of the case.

§ 90.702, Fla. Stat. (2014). By amending section 90.702, the Legislature signaled its intent "to tighten the rules for admissibility of expert testimony," Perez v. Bell South Telecommunications, Inc., 138 So. 3d 492, 497 (Fla. 3d DCA 2014), and "to prohibit 'pure opinion testimony.'" Giaimo, 154 So. 3d at 388 (citing Ch. 13-107, Laws of Fla.).

Under Daubert, the trial court not only evaluates a putative expert's credentials, but also serves as a gatekeeper in "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. When expert scientific testimony is proffered, the trial court must, under Daubert, assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592–94 (listing non-exclusive factors to consider in assessing the reliability of an expert's opinion).

Under Daubert, although "an expert may be qualified by experience," it does not follow "that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." United States v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004) ("If admissibility could be established merely by the ipse dixit of an admittedly qualified expert, the reliability prong

11

would be, for all practical purposes, subsumed by the qualification prong."); see also Charles W. Ehrhardt, 1 Fla. Prac., Florida Evidence § 702.3 (2015 ed.) ("When an expert is relying primarily on experience, the witness must explain how that experience leads to the opinion, why the experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts." (citing Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331 (11th Cir. 2009), and Primiano v. Cook, 598 F.3d 558 (9th Cir. 2010))). Under section 90.702, as amended, while the expert's qualifications may well remain germane, an expert witness must explain the logic and relevance of the expert opinion.

In the present case, Dr. Tulsiak's opinions amounted to much more than ipse dixit. See Booker, 166 So. 3d at 194–95. Cf. Giaimo, 154 So. 3d at 388 (concluding expert's testimony was not the product of reliable principles and methods where the expert was asked how he arrived at his opinion and stated "'when I was asked and thought about it, that is the answer that I came up with'"). Dr. Tulsiak reviewed the child's medical records, the autopsy report, EMS records, and statements from witnesses who observed Craven's medical condition in the last hours and minutes of his life.

In support of his opinion that the ambulance should not have left Craven behind on its first run, Dr. Tulsiak invoked (in addition to his first-hand knowledge of children's respiratory problems, his 30 years' experience as an emergency room

12

physician, and his 25 years as an advisor, first to Hillsborough County Fire Rescue, and then to Tampa Fire Department, Rescue Division[9]), as one salient "reliable principle[]" EMS's own protocol requiring transport to a hospital in the event an infant was experiencing respiratory distress. § 90.702(2), Fla. Stat. Whatever the precise nature of Craven's respiratory problems, he stopped breathing, depriving his brain of oxygen, as explained by Dr. Tulsiak. We reject EMS's contention that Dr. Tulsiak's opinion is unfounded speculation or amounts to no more than reasoning post hoc, ergo propter hoc. Cf. Perez, 138 So. 3d at 499.

On the contrary, the record makes clear that Dr. Tulsiak's testimony was "the product of reliable principles and methods," and that those principles and methods were applied "reliably to the facts of the case." § 90.702, Fla. Stat. His opinions on the standard of care and the consequences of failing to adhere to that standard are therefore admissible even under Daubert, whose gatekeeping function was "'not intended to supplant the adversary system or the role of the jury:

---

[9] In applying Daubert, the court in Primiano v. Cook, 598 F.3d 558, 565 (9th Cir. 2010), said:

> "Despite the importance of evidence-based medicine, much of medical decision-making relies on judgment—a process that is difficult to quantify or even to assess qualitatively. Especially when a relevant experience base is unavailable, physicians must use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties" to "mak[e] a sound judgment."

(citation omitted).

13

"vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.""" Adams, 760 F.3d at 1334 (quoting United States v. Ala. Power Co., 730 F.3d 1278, 1282 (11th Cir. 2013)). Accordingly, we reverse the trial court's exclusion of Dr. Tulsiak's testimony and the summary judgment the exclusion gave rise to, and remand for further proceedings.

Reversed and remanded.

BILBREY, J., CONCURS; OSTERHAUS, J., CONCURS IN RESULT WITH OPINION.

OSTERHAUS, J., concurring in result with opinion.

I concur with my colleagues' conclusion that Dr. Tulsiak's expert testimony should not have been excluded. His testimony could be applied reliably under Daubert to at least one competing version of the facts; if, for instance, the child was in respiratory distress and EMS failed to evaluate his airway and transport him for medical care as required by its published protocol.

I do not, however, join the majority opinion's inapplicable Frye-based discussion, nor its suggestion in a footnote that a constitutional challenge to the Daubert standard in § 90.702, Florida Statutes, might have netted a Frye-based analysis. Neither party argued that the Frye test applied here. And even if they had, our court's decisions have correctly required the 2013 modifications to § 90.702 to be applied to ascertain the admissibility of expert opinion. See, e.g., Perry v. City of St. Petersburg, 171 So.3d 224, 225 (Fla. 1st DCA 2015) (remanding with directions to apply the Daubert test as codified in the Florida Evidence Code).