# Third District Court of Appeal

## State of Florida

Opinion filed February 12, 2025.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D23-1725
Lower Tribunal No. 20-18605
_____

**Sunbelt Rentals, Inc.,**
Appellant,

vs.

**Melissa Burns, etc.,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Reemberto Diaz, Judge.

Wallen | Kelley, and Todd L. Wallen; Butler Weihmuller Katz Craig, LLP, and F. Bryant Blevins (Tampa), for appellant.

The Haggard Law Firm, P.A., and James C. Blecke, for appellee.

Before LOGUE, C.J., and LOBREE and BOKOR, JJ.

LOGUE, C.J.

Sunbelt Rentals, Inc. appeals a final judgment in favor of the Estate of Matthew Burns following a jury trial in a product liability wrongful death action. Sunbelt raises several arguments on appeal. We address two: (1) whether the testimony of two of the Estate's experts should have been excluded under the Daubert[1] standard; and (2) whether the testimony of one of the Estate's experts should have been excluded as surprise testimony. Sunbelt argues that had the testimony of these experts been excluded, then the record would be insufficient to support the jury's finding of causation. For the reasons stated below, we reject these challenges and affirm the jury verdict.

## **BACKGROUND**

Given the nature of this appeal, it is necessary to review the facts and proceedings below in some detail. Matthew Burns was last seen alive on the night of July 12, 2019, in his auto repair shop. The following morning, he was found on the floor of the shop, dead from carbon monoxide poisoning. The question at the heart of the case concerned the source of the carbon monoxide that killed Burns.

The Estate contended the carbon monoxide came from a BlastPro BP 10-27 Shot Blaster, which Burns rented from Sunbelt to resurface the floors

---

[1] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

of his auto repair shop. The Shot Blaster was a piece of riding equipment powered by a 25-horsepower propane motor that was designed to strip floors with high pressure blasts of recirculating shot. The Shot Blaster's manual indicated that a carbon monoxide monitor should be used when operating the Shot Blaster. Sunbelt did not provide Burns a carbon monoxide monitor when it rented him the Shot Blaster. Also, it did not advise him regarding the use of a carbon monoxide monitor when instructing him on the use of the machine. The Estate filed suit against Sunbelt for strict liability, negligent failure to warn, and negligent failure to maintain.

## I.     Pre-Trial Proceedings – The Estate's Expert Opinions

### A. Dr. Weaver

The Estate retained Dr. Lindell Weaver as its medical expert witness. Dr. Weaver provided an affidavit containing his expert opinions. Dr. Weaver opined that "even a low concentration of carbon monoxide (i.e., like occurs when someone operates a combustion engine in a partially enclosed space like a warehouse even with doors open) over a long period of time can result in someone succumbing to carbon monoxide poisoning." Dr. Weaver further opined that the operation of small combustion engines, such as the Shot Blaster, "even in a space that is perceived or appears to be 'well ventilated' can cause carbon monoxide poisoning." Dr. Weaver explained that this is

3

because low concentrations of carbon monoxide with long periods of exposure can injure the body and cause death. Dr. Weaver cited to a study of small gas-powered tools with smaller engines than the Shot Blaster that produced poisoning levels of carbon monoxide when run in garages with the garage doors open.

Dr. Weaver further explained that a "key consideration for exposure to carbon monoxide is the proximity of a person to the source of carbon monoxide." Dr. Weaver stated that the "highest concentration of carbon monoxide produced by combustible engines is from the engine's exhaust pipe opening[,]" and noted that the Shot Blaster's exhaust was in close proximity to the operator of the Shot Blaster. "Thus, [ ] Burns, while operating the Shot Blaster, regardless of whether the garage door was open or closed, was exposed continuously to the highest levels of carbon monoxide."

Dr. Weaver further opined Burns did not have the requisite time to lower his levels of carboxyhemoglobin "if he worked on the machine continuously or with short breaks throughout the day/evening of the incident." Thus, Dr. Weaver opined it was more likely than not that Burns, because of operating the Shot Blaster for several hours in one day, had an elevated carboxyhemoglobin level that never returned to baseline levels, which

shortened the time of critical exposure and significantly increased the opportunity for his poisoning. As a result, Dr. Weaver opined that,

> within a reasonable degree of medical probability, [ ] Burns inhaled lethal amounts of carbon monoxide produced by the [Shot Blaster] over the period of July 12, 2019 to July 13, 2019. This was confirmed by [ ] Burns' post-mortem carboxyhemoglobin level of 57%. It is my opinion [ ] Burns succumbed to the levels of carbon monoxide, lost consciousness and died shortly thereafter.

Dr. Weaver indicated his opinion was based on his review of various documents, including the police report, police photographs, fire rescue report, medical examiner's report, photographs and videos of Burns on July 12, 2019, photographs of the garage, deposition transcripts of Burns' wife, and the affidavits of Robert Lemoine (Burns' employee), and Kos Galatsis (the Estate's engineering expert). He also indicated his opinion was based on his "training and experience as a board-certified internist, with training and experience in pulmonology and critical care, with decades of experience treating and studying carbon monoxide poisonings[.]"

Dr. Weaver was deposed on April 7, 2023. Dr. Weaver acknowledged he had not conducted any site inspections or tested any machinery. He explained that he drew his opinion about the cause and origin of the carbon monoxide that killed Burns from the fact that Burns was operating a machine that produced carbon monoxide (the Shot Blaster) and because he had ruled

out other sources of carbon monoxide based on his review of deposition testimony.

Dr. Weaver testified he had not conducted any investigation into the ventilation system, airflow, or air exchange rate in Burns' garage on July 12-13, 2019. He further agreed that based on the deposition testimony he reviewed of Lemoine and Burns' two garage neighbors, Burns was not displaying symptoms of carbon monoxide exposure when he was last seen. Dr. Weaver also agreed that, if Burns had gone home after he was last seen on the night of July 12, 2019, he would likely be alive today.

Dr. Weaver acknowledged he had no precise knowledge as to what occurred after Burns was last seen on the night he died but based on Lemoine's observation that not much more of the floor had been stripped when he arrived the next day, Dr. Weaver took this to indicate Burns did not operate the Shot Blaster for very long on his own after Lemoine left for the day. Dr. Weaver opined the Shot Blaster "had to" put out more than 50 parts per million of carbon monoxide while the garage door was open during the day of July 12, 2019 because "we know what [ ] Burns' carboxyhemoglobin was at death," even if he was not showing signs of carbon monoxide poisoning when he was last seen that night.

Dr. Weaver indicated he also relied on Lemoine's testimony, which indicated Lemoine "certainly developed signs and symptoms highly consistent with carbon monoxide poisoning" by the time he left that evening. While Dr. Weaver acknowledged he had not examined Lemoine, he stated there was a "differential diagnosis" to explain his symptoms.

Dr. Weaver also disagreed with the testimony of one of the EMS responders that a forklift was on when EMS arrived, noting that the police arrived at the scene first and indicated nothing was running. Dr. Weaver also noted the EMS responder's testimony did not reflect that he had a good memory of the day in question whereas the police officer's testimony indicated he had a good memory of that day. Finally, Dr. Weaver estimated Burns' carboxyhemoglobin levels to be 30-40% at 8:00 pm or 8:30 pm on the night he died.

### B. Galatsis

The Estate retained Kos Galatsis, Ph.D. as its engineering and carbon monoxide expert witness. Galatsis provided an affidavit containing his expert opinions. In his affidavit, he opined that Sunbelt should not have rented or marketed the Shot Blaster for use in indoor or partially enclosed environments. Galatsis explained that the Shot Blaster operated with a small combustible engine and produced carbon monoxide, "which can accumulate

over time in an indoor or partially enclosed environment, even in areas that appear to be well ventilated, and can overcome a person without warning."

Galatsis cited to CDC/National Institute for Occupational Safety and Health (NIOSH) Publication 96-118, which stated that tools with small combustible engines, such as the Shot Blaster, cannot be used in an indoor or partially enclosed environment. "This is because, among other things, the dangers posed by the amount of carbon monoxide emitted by the engine and that carbon monoxide 'poisonings can occur quickly, even in the presence of what many would consider "adequate ventilation"' and in areas that many would define as relatively open spaces, such as parking garages."

Galatsis also explained in his affidavit that a Shot Blaster's engine, because it is powered by liquid propane, could produce excessive carbon monoxide gas "even when [it is] run in areas where there is sufficient oxygen available for combustion[, because it does] not emit exhaust smoke. Thus, victims may be unaware of any potential problems." Galatsis further explained that "[c]arbon monoxide is . . . produced when fuels such as liquid propane are burned and can rapidly accumulate even in areas that might appear to be well ventilated."

Galatsis indicated his opinions were based on his review of the pleadings, discovery responses, Shot Blaster Owner's Manual, police report,

8

medical examiner's report, photographs of the scene of the incident dated August 2, 2019, photographs and video taken on or about the date of the incident, depositions of various witnesses, and Lemoine's affidavit. Galatsis also indicated his opinions were based on his education, training, experience, knowledge, skill, and review of various reference materials cited in his affidavit. Galatsis indicated he also inspected the Shot Blaster and the garage where the incident took place.

In addition to his affidavit, Galatsis was deposed on April 5, 2023. In his deposition, Galatsis testified he based his opinion that the carbon monoxide that killed Burns came from the Shot Blaster on his review of the police and fire rescue reports and Lemoine's testimony regarding his symptoms that led to him leaving work for the day, which were consistent with carbon monoxide exposure. Galatsis testified he did not do any testing to determine what the air circulation, amount of fresh air, or exchange rate of air was in the garage throughout the day while Burns ran the Shot Blaster. Galatsis indicated he would not be providing any opinion regarding what the carbon monoxide level would have been in the garage with the door open, the air conditioning on, and the exhaust fan running. Galatsis went on to qualify this response, however, indicating that while he did not know how

much carbon monoxide was in the garage, he did know it was not zero and that there was some presence of carbon monoxide.

## II. Pre-Trial Proceedings – Daubert Motions

Sunbelt filed a Daubert motion to prevent Dr. Weaver from speculating at trial regarding the source of the carbon monoxide that killed Burns. Sunbelt argued that while Dr. Weaver was qualified to testify on how much carbon monoxide was required to cause Burns' death, Dr. Weaver did not do anything to investigate the source of the carbon monoxide. Instead, Sunbelt maintained Dr. Weaver chose which lay witness testimony to believe and this invaded the province of the jury and was not the product of any reliable methodology.

Sunbelt filed a second Daubert motion to preclude Galatsis from providing expert opinion at trial. Sunbelt argued Galatsis' opinions were speculative and not based on any accepted engineering methodology or any carbon monoxide testing of the garage space where Burns was found. Sunbelt further contended the Estate's prior expert engineer conducted testing on the Shot Blaster and indicated the testing did not produce any reliable data supporting the idea that the Shot Blaster could emit dangerous quantities of carbon monoxide.

In response, the Estate argued Dr. Weaver's and Galatsis' opinions were supported by their years of experience with carbon monoxide poisoning, the autopsy report confirming death by carbon monoxide poisoning, Lemoine's testimony on the lengthy operation of the Shot Blaster and his subsequent symptoms that led to him leaving for the day, Sunbelt's policies and procedures, the Shot Blaster manual, and accepted industry studies and guidelines. The trial court denied the motions following a hearing.

### III. Trial Proceedings

An eight-day jury trial was conducted. At trial, the Sunbelt employee who instructed Burns on the operation of the Shot Blaster testified he did not tell Burns he needed to use a carbon monoxide detector to operate the Shot Blaster. He also acknowledged he was responsible for instructing Burns on the safe operation of the Shot Blaster. Further, the Shot Blaster manual required use of a carbon monoxide monitor with the Shot Blaster, and he never provided the manual to Burns.

Lemoine testified he was working with Burns in the garage on July 12, 2019. He was present when Burns operated the Shot Blaster for roughly eight hours that day, with only "little breaks." Lemoine further testified he went home that day because he was not feeling well. He stated he had a "really bad headache" and was "sick to [his] stomach." He also described

11

having blurred vision at times and stated his heart was racing and he felt "jittery." He testified he told Burns he was not feeling well, and Burns told him he "[didn't] look so good" and sent him home.

Lemoine also testified that the cars on the car lift in the garage were not moved or worked on while he and Burns were working on the garage floor and that only one had an engine in it. He also stated neither of them used the forklift that day.

The Estate presented expert testimony from Dr. Lila Laux, an industrial psychologist with a specialization in human factors engineering, and she testified the warnings on the Shot Blaster with respect to carbon monoxide were not adequate to alert someone to the deadliness and the need for some means of determining whether the operator was being exposed. Dr. Laux further opined it was unreasonably dangerous to use the Shot Blaster indoors without a carbon monoxide monitor. She was also critical of Sunbelt's failure to warn Burns to get a carbon monoxide monitor.

Galatsis testified to his opinion that the Shot Blaster's design for indoor use rendered it unreasonably dangerous and that Sunbelt provided inadequate training and instruction to Burns. Galatsis also testified that Sunbelt should have provided Burns with a carbon monoxide monitor because it knew he would be using the Shot Blaster indoors. Galatsis further

opined that Burns died from carbon monoxide released by the Shot Blaster, citing in support the fact that the Shot Blaster had an engine that emitted carbon monoxide, Burns operated the machine for eight hours indoors, Lemoine experienced symptoms that were consistent with carbon monoxide exposure, Burns' post-mortem carboxyhemoglobin level was 57%, and the levels of carbon monoxide in the garage the following morning were measured by fire rescue at 240 parts per million.

Dr. Weaver testified he estimated Burns lost consciousness around 10:00 pm and died around midnight. He opined the Shot Blaster was the source of the carbon monoxide that killed Burns and explained that he ruled out other potential sources of carbon monoxide such as the cars on the lifts, the box truck outside, and the forklift.

Following deliberations, the jury returned a verdict in favor of the Estate on July 19, 2023. It assessed 32% comparative fault to Burns. Sunbelt's Motion to Set Aside Verdict and to Enter Judgment in Accordance with Motion for a Directed Verdict or, in the Alternative, Motion for a New Trial was denied following a hearing. This appeal timely followed.

13

# LEGAL ANALYSIS

## I.    Daubert Issues

On appeal, Sunbelt contends that the testimony of two of the Estate's experts should have been excluded under the Daubert standard, which governs the admissibility of scientific testimony. This Court reviews a trial court's ruling on a Daubert motion for abuse of discretion. See Royal Caribbean Cruises, Ltd. v. Spearman, 320 So. 3d 276, 288 n.9 (Fla. 3d DCA 2021) (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).

> Under Daubert, expert testimony is admissible if it is both relevant and reliable. The United States Supreme Court explained in Daubert that the trial court is tasked with being the "gatekeeper" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Under this gatekeeping authority, "[a] trial judge must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" However, as noted in Daubert, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

Spearman, 320 So. 3d at 290 (internal citations omitted).

### A. Dr. Weaver's Opinion

Sunbelt asserts Dr. Weaver's expert opinion should have been excluded because Dr. Weaver failed to rule out other potential sources of

14

carbon monoxide prior to opining that the Shot Blaster was the source of the carbon monoxide that caused Burns' death. Noting Dr. Weaver did not conduct any testing, Sunbelt argues he simply assumed that the Shot Blaster was the source. A review of the record, however, indicates that Dr. Weaver provided a fact-based chain of reasoning sufficient for the trial court to conclude his testimony was admissible under the Daubert standard.

First, Dr. Weaver's affidavit established that he conducted a detailed review of the factual evidence and Galatsis' affidavit. In support of his opinion, Dr. Weaver explained the science behind how carbon monoxide poisoning occurs and how even low concentrations of carbon monoxide with long periods of exposure can injure the body and cause death. He cited relevant scientific studies.

Second, Dr. Weaver ruled out other potential sources of carbon monoxide in the garage based on the factual evidence, which he opined did not present any reliable evidence that the carbon monoxide originated from another source. Dr. Weaver also testified that a "differential diagnosis" based on Lemoine's testimony regarding symptoms he experienced indicated Lemoine "certainly developed signs and symptoms highly consistent with carbon monoxide poisoning" by the time he left that evening.

Third, Dr. Weaver testified that testing was unnecessary to verify his opinion. He explained this was because "the test was already done," referring to testing that showed Burns' post-mortem carboxyhemoglobin level at 57%, which he opined could not have happened "just like that." Instead, it was Dr. Weaver's opinion that it was "an accumulation effect that resulted in a level of 57 percent."

This record demonstrates that Dr. Weaver's testimony was "the product of reliable principles and methods[,]" and that those principles and methods were applied "reliably to the facts of the case." § 90.702, Fla. Stat. His opinions were therefore admissible under Daubert. See also Baan v. Columbia Cnty., 180 So. 3d 1127, 1133-34 (Fla. 1st DCA 2015).

### B. Galatsis' Opinion

Sunbelt similarly faults Galatsis for failing to conduct any testing or ruling out any other potential sources of carbon monoxide prior to opining that the Shot Blaster was the source of the carbon monoxide that caused Burns' death. A review of the record, however, indicates that Galatsis also provided a fact-based chain of reasoning sufficient for the trial court to conclude his testimony was admissible under the Daubert standard.

As with Dr. Weaver, Galatsis' affidavit also established that he conducted a detailed review of the factual evidence. Galatsis indicated he

16

also reviewed the Shot Blaster Owner's Manual and inspected the Shot Blaster and the garage where the incident took place. Galatsis further indicated his opinions were based on his education, training, experience, knowledge, skill, and review of various reference materials cited in his affidavit.

In support of his opinion that the carbon monoxide produced by the Shot Blaster caused Burns' death, Galatsis explained the science behind combustion engines and the production of carbon monoxide. He stated that the Shot Blaster's liquid propane engine could produce excessive carbon monoxide that could accumulate over time in an indoor or partially enclosed environment, even in areas that appear to be well ventilated, and could overcome a person without warning because it did not emit exhaust smoke.

In support of his opinion that Sunbelt should not have rented or marketed the Shot Blaster for use indoors or in partially enclosed environments, Galatsis cited reliable publications stating that tools with small combustible engines (such as the Shot Blaster) cannot be used in an indoor or partially enclosed environment.

On cross-examination during trial, Galatsis testified it was not necessary to test the Shot Blaster to determine the concentration of carbon monoxide it produced because the EPA already tested this, and their results

17

were publicly available information. Galatsis further explained that testing under conditions like what Burns experienced was not necessary because the evidence already showed that the carbon monoxide remained in the garage the next day. Galatsis relied on the following facts: (1) Burns died from carbon monoxide poisoning; (2) Lemoine had symptoms of exposure to carbon monoxide; and (3) the following morning when Burns' body was discovered, fire rescue detected high levels of carbon monoxide in the garage, which required the garage to be ventilated for an hour before it was safe to enter.

Based on this record, it is evident that Galatsis' opinions were "the product of reliable principles and methods[,]" and that those principles and methods were applied "reliably to the facts of the case." § 90.702, Fla. Stat. His opinions were therefore admissible under Daubert. See also Baan, 180 So. 3d at 1133-34.

### C. Motion for a Directed Verdict

"A trial court is not authorized to grant a judgment in accordance with a motion for directed verdict if there is any evidence or reasonable inference to support the opposing position." Behar v. Root, 393 So. 2d 1169, 1170 (Fla. 3d DCA 1981). Because Dr. Weaver's and Galatsis' expert opinions were properly admitted at trial and were sufficient to allow the jury to conclude that

18

the Shot Blaster was the source of the carbon monoxide that caused Burns' death, Sunbelt's argument that it was entitled to a directed verdict based on these perceived errors necessarily fails.

## II. New Theory of Liability and New Opinions for New Trial

Sunbelt contends Galatsis provided previously undisclosed expert opinions at trial regarding the following: (1) the cause of the symptoms experienced by Lemoine; and (2) the ventilation dynamics in Burns' garage when the door was open. It raised these issues in its Motion for New Trial, which we review for abuse of discretion. Silva v. de la Noval, 307 So. 3d 131, 134 (Fla. 3d DCA 2020).

On the issue of the cause of Lemoine's symptoms, Galatsis' deposition testimony attributed Lemoine's symptoms to carbon monoxide exposure and identified this as evidence that the carbon monoxide that caused Burns' death came from the Shot Blaster. Notably, Dr. Weaver also testified at his deposition that his opinions relied on Lemoine's testimony, which indicated he "certainly developed signs and symptoms highly consistent with carbon monoxide poisoning" by the time he left that evening. While Dr. Weaver acknowledged he had not examined Lemoine, he stated there was a "differential diagnosis" to explain his symptoms. Accordingly, this was neither a new theory of the case nor surprise expert opinion.

19

The closer question presented concerns what Sunbelt calls the accumulation theory. Sunbelt contends Galatsis indicated during his deposition that he would not be providing an opinion that carbon monoxide "accumulated so as to become unsafe when the Shot Blaster was operated with the garage door open on July 12th." Sunbelt argues Galatsis then did a "180-degree turn at trial, suddenly becoming an expert on the ventilation dynamics in Burns' garage—telling the jury [carbon monoxide] 'built up' throughout the day while the garage door was open, and eventually became 'lethal.'"

Galatsis' affidavit, however, did reference accumulation, stating that "Carbon Monoxide is a lethal poison that is produced when fuels such as liquid propane are burned and can rapidly <u>accumulate</u> even in areas that might appear to be well ventilated." Galatsis also referenced accumulation in his opinion that Sunbelt should not have rented or marketed the Shot Blaster for use in indoor or partially enclosed environments because it produces carbon monoxide, "which can <u>accumulate</u> over time in an indoor or partially enclosed environment, even in areas that appear to be well ventilated, and can overcome a person without warning."

Thus, while the deposition testimony cited by Sunbelt appears to support its argument that Galatsis provided new opinions at trial, another

20

plausible reading of the testimony exists. The testimony can be read as indicating that Galatsis was not intending to provide an opinion regarding the quantifiable level of carbon monoxide in the garage. In other words, what Galatsis was saying in his testimony was that he would not be providing an opinion regarding an amount of carbon monoxide in parts per million.

This can be inferred from two points of testimony. First, Galatsis acknowledged that he had not conducted any testing regarding the air circulation, amount of fresh air, or exchange rate of air in the garage and thus would not be providing an opinion on the level of carbon monoxide on the day in question because he had not "undertaken that analysis." Second, after being asked the same question several different times in several different ways, Galatsis qualified his prior responses and noted, "[b]ut <u>we do know that it's not zero</u>, and, hence, we do know that there is some presence of carbon monoxide, <u>but we do not know exactly how much</u> because I have not performed that analysis."

Thus, the trial court was within its discretion to find that Galatsis' trial testimony did not include any new opinions sufficient to justify their exclusion from trial because (1) he did not provide any opinion regarding a specific amount of carbon monoxide in parts per million in the garage; and (2) the opinions disclosed in his affidavit were in line with his testimony at trial – that

the Shot Blaster's carbon monoxide output accumulated after it ran inside the garage, despite being perceived to be well ventilated, and that this accumulation of carbon monoxide eventually overcame Burns and led to his death. We accordingly find no abuse of discretion in the denial of the motion for new trial.

Affirmed.