# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

Case No. 5D2024-1567
LT Case No. 2017-CA-5800

———————————————

PRISCILLA LEWIS, Personal
Representative of the Estate of
Clarence Lewis,

    Appellant,

    v.

NORFOLK SOUTHERN RAILWAY
COMPANY,

    Appellee.

———————————————

On appeal from the Circuit Court for Duval County.
G.L. Feltel, Jr., Judge.

Carmen A. De Gisi, of De Gisi Law Group, LLC, Lafayette Hill,
Pennsylvania, and Jonathan Sternberg, of Jonathan Sternberg,
Attorney, P.C., Kansas City, Missouri, for Appellant.

Ira L. Podheiser, of Burns White LLC, Pittsburgh, Pennsylvania,
and Andrew J. Knight, II, of Moseley, Prichard, Parrish, Knight
& Jones, Jacksonville, for Appellee.

September 19, 2025


SOUD, J.

Appellant Priscilla Lewis brought a wrongful death action against Appellee Norfolk Southern Railway Company under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 et seq., claiming that her husband Clarence Lewis died from chronic lymphocytic leukemia caused by occupational exposure to diesel exhaust during his 39-year career as a railroader. The trial court ultimately entered summary judgment in favor of Norfolk after excluding the testimony of Lewis's liability expert under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

Mrs. Lewis appeals the summary judgment and argues the trial court erred in its conclusion that her liability expert's testimony did not satisfy *Daubert*'s requirements. We have jurisdiction. *See* Art. V, § 4(b)(1), Fla. Const.; Fla. R. App. P. 9.030(b)(1)(A). We reverse the summary judgment and remand the case to the trial court for further proceedings, concluding the expert's testimony was admissible under *Daubert*, thus precluding summary final judgment.

I.

Mr. Lewis worked for Norfolk from May 1975 until June 2014, working primarily out of the Simpson Yard in Jacksonville, Florida.[1] At various points, Mr. Lewis worked as a coal laborer, switchman, conductor, and engineer. According to his wife, Mr. Lewis worked mainly as an engineer. The record before us describes a demanding job—one that involved working near running engines and other diesel-powered machinery while switching cars, building trains, and operating trains locally. Mrs. Lewis presented evidence that in this work, Mr. Lewis was exposed to diesel exhaust daily, often returning home with diesel fuel and soot on his clothes and in his hair.

Coworkers testified in depositions that diesel spills in the yard also were not uncommon. One coworker, Bobby Jamison, testified that Mr. Lewis was taken to a local hospital after one particular

---

[1] The facts as summarized in our opinion are viewed in the light most favorable to Mrs. Lewis as the non-moving party below. *See Schramm v. Adams Homes of Nw. Fla., Inc.*, 414 So. 3d 352, 355 (Fla. 5th DCA 2025).

chemical spill, after which Mr. Lewis suffered from a severe cough "for years." Further, another coworker testified that employees never received any warning about risks associated with exposure to diesel exhaust.

In 2011, at 57 years of age, Mr. Lewis was diagnosed with chronic lymphocytic leukemia, a form of cancer. His treatment regimen required he retire from Norfolk in the summer of 2014. Just three months after retiring, in September, Mr. Lewis died.

In 2017, Mrs. Lewis, as the personal representative of her husband's estate, filed a FELA wrongful death action against Norfolk. She alleged Norfolk was negligent in causing Mr. Lewis's long-term exposure to known carcinogens—diesel exhaust and benzene, a component of diesel exhaust—throughout his employment. She further claimed Norfolk was negligent by failing to provide a reasonably safe workplace by failing to take certain protective measures and by failing to warn of the risk of cancer when exposed to diesel exhaust and benzene, a component of diesel exhaust.

To support her cause of action, Mrs. Lewis designated two experts: Dr. Paul Rosenfeld, as a liability expert, and Dr. Mark Levin, as her medical expert on causation. Pertinent here, Dr. Rosenfeld opined that the railroad industry has known since the 1950s that diesel exhaust is a human carcinogen. He cited evidence linking its exposure to increased cancer risk, particularly among railroad workers. Considering these recognized risks, numerous agencies and industry groups recommend protective measures such as respirators and air-conditioned cabs.

Nevertheless, Dr. Rosenfeld says that despite knowing diesel exhaust exposure's carcinogenicity since 1955 and industry and government findings, Norfolk did not adopt any internal policy about it until 2006, in which it claimed to its employees in a "Diesel Information Sheet" that there is a "lack of evidence of chronic, non-cancer health effects at occupational exposure levels" and "[t]here also remains a question in the scientific community as to whether diesel exhaust causes lung cancer."

Based upon the Environmental Protection Agency's Superfund Risk Assessment tool, Dr. Rosenfeld further opined that

Mr. Lewis was subjected to long-term exposure to significant, above-background levels of benzene from locomotive diesel exhaust emissions, which placed Mr. Lewis at a substantially elevated risk of getting cancer. In forming this opinion, Dr. Rosenfeld quantified the "inhalation unit risk factor" by calculating the ambient diesel particulate matter ("DPM") concentration in the occupational environment. According to Dr. Rosenfeld, DPM is "used as a surrogate measure of exposure to whole diesel exhaust." Dr. Rosenfeld did note that his assessment considered potential liability based on exposure and did not determine the specific risk of contracting chronic lymphocytic leukemia.

Dr. Rosenfeld ultimately concluded that Norfolk did not meet a reasonable standard of care throughout Mr. Lewis's career. More specifically, Norfolk failed to: (i) provide a reasonably safe place to work; (ii) warn of the health risks associated with exposure to diesel exhaust and benzene; (iii) implement controls to minimize diesel exhaust; (iv) comply with the Federal Locomotive Inspection Act and OHSA standards; and (v) provide air monitoring/exposure monitoring.

Norfolk moved to exclude Dr. Rosenfeld's testimony, arguing that his methodology of converting elemental carbon ("EC") to DPM was unreliable because it is untested and has not been subjected to peer review or publication. Specifically, Norfolk argued below, as it does here, that the generally accepted method for calculating diesel exhaust exposure is by measuring EC and comparing that measurement to exposure guidelines. Dr. Rosenfeld's methodology of converting the EC levels to DPM was unreliable because he "took the elemental carbon number from various studies he looked at from other railroads, [and] convert[ing] it to diesel particulate matters[,] [h]e's basically doing the opposite or going backwards." Further, Norfolk argues that literature provides no consensus for rates of conversion for Dr. Rosenfeld's conversion method.

Norfolk also argues that Dr. Rosenfeld's analysis was not reliably applied to the facts in this case because he: (a) utilized an EPA Superfund Risk Assessment tool meant for Superfund sites

4

and not railyards; and (b) his data and assessment tools related to risks of lung cancer rather than chronic lymphocytic leukemia.

The learned and conscientious trial judge granted Norfolk's motion, concluding that Dr. Rosenfeld's testimony must be excluded under *Daubert*. In its written order, the trial court determined that Dr. Rosenfeld's opinions, which "build off his conclusion that [Mr. Lewis] was exposed to a harmful level of diesel fumes over the course of his career with [Norfolk] and that exposure was the cause of him developing [chronic lymphocytic leukemia]" were "not grounded on reliable principles and methods, and the methods he employed were not reliably applied to the facts in this case." The trial court specifically found that Dr. Rosenfeld "converted EC levels to DPM, which is apparently unique to his personal methodology." Because this approach is unsupported by the literature, "[t]his renders Dr. Rosenfeld's most foundational opinion, Decedent's exposure level, unreliable under the *Daubert* inquiry."

The trial court further found that applying this data by using the EPA Superfund Risk Assessment tool is unreliable because Dr. Rosenfeld failed to show "how that EPA tool can be reliably applied to the facts of this case" because "the risk assessment tool itself is supported by data based only upon lung cancer . . . . Absent some evidentiary correlation to [chronic lymphocytic leukemia], Plaintiff's disease," the trial court was "concerned Dr. Rosenfeld's opinions on this matter would require the jury to make that connection based solely on speculation and conjecture. Stated differently, this lack of 'fit' would create substantial risk of misleading the jury."

As a result, Norfolk moved for summary judgment on the grounds that Mrs. Lewis could not prove Norfolk was negligent in the absence of admissible testimony. Norfolk also argued that Mrs. Lewis could not prove causation either because her causation expert, Dr. Levin, relied on Dr. Rosenfeld's conclusions on liability in forming his opinion that Norfolk's negligence caused Mr. Lewis's cancer and death. In light of the trial court's exclusion of Dr. Rosenfeld's testimony, Priscilla Lewis conceded she could not meet her burden of proof under FELA. The trial court granted Norfolk's motion and entered final summary judgment in its favor.

This appeal followed.

## II.

We review for abuse of discretion the trial court's exclusion of Dr. Rosenfeld's testimony under *Daubert*. *See Sunbelt Rentals, Inc. v. Burns*, 402 So. 3d 1178, 1185 (Fla. 3d DCA 2025). The trial court's granting of final summary judgment is reviewed de novo. *See Duran v. Crab Shack Acq., FL, LLC*, 384 So. 3d 821, 823 (Fla. 5th DCA 2024).

## A.

When properly challenged, the proponent of expert opinion testimony must establish the basis for the testimony's admissibility. *See Royal Caribbean Cruises, Ltd. v. Spearman*, 320 So. 3d 276, 289 (Fla. 3d DCA 2021). Florida courts follow the *Daubert* standard when determining the admissibility of expert opinion testimony, which is codified in section 90.702, Florida Statutes:

> If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion or otherwise, if:
>
> (1)  The testimony is based upon sufficient facts or data;
>
> (2)  The testimony is the product of reliable principles and methods; and
>
> (3)  The witness has applied the principles and methods reliably to the facts of the case.

This statute, as does *Daubert*, charges the trial court with an important gatekeeping function to ensure an expert "employs in the court room the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See*

*Cristin v. Everglades Corr. Inst.*, 310 So. 3d 951, 955–56 (Fla. 1st DCA 2020) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). And when expert opinion testimony is found to be both relevant and reliable, it is admissible. *See Vitiello v. State*, 281 So. 3d 554, 560 (Fla. 5th DCA 2019) (citing *Daubert*, 509 U.S. at 589); *see also Royal Caribbean Cruises, Ltd.*, 320 So. 3d at 290 (the trial court's work as gatekeeper is to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." (alteration in original) (quoting *Daubert*, 509 U.S. at 597)).

In considering the testimony's relevance, the trial court must determine whether it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *See Vitiello*, 281 So. 3d at 560 (quoting *Daubert*, 509 U.S. at 591). That is to say, the "testimony must be 'tied to the facts of the case [so] that it will aid the jury in resolving a factual dispute.'" *See id.* (alteration in original) (quoting *Daubert*, 509 U.S. at 591).

Evaluating reliability requires the trial court to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *See id.* (quoting *Daubert*, 509 U.S. at 592–93). To this end, the gaze of the court is fixed upon the methodology of the expert witness, not simply the substance of his opinion. And the expert's opinion must be based upon "knowledge" and not simply "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

*Daubert* provided factors the trial court may consider when assessing reliability, though they were not designed to be a "definitive checklist or test"—whether the theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community. *See id.* at 592–94; *see also Vitiello*, 281 So. 3d at 560; *Royal Caribbean Cruises, Ltd.*, 320 So. 3d at 290–91. *Daubert*'s test of reliability is "flexible" and the "specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co.*, 526 U.S. at 141; *see also*

*Vitiello*, 281 So. 3d at 560. The trial court has "considerable leeway" in how it determines whether expert testimony in a given case is reliable. *See Vitiello*, 281 So. 3d at 560 (quoting *Kumho Tire Co.*, 526 U.S. at 152). If the trial court determines the expert's methodology satisfies this threshold reliability, the court must also determine whether the methods and principles were reliably applied to the facts of the case. *See id.*

The trial court's function under *Daubert* is not designed to be so exacting as to deprive a proponent of expert testimony of her right to trial by jury. *See Peng v. Citizens Prop. Ins.*, 337 So. 3d 488, 493 (Fla. 3d DCA 2022) ("[T]he trial court must be careful not to intrude upon the adversary system . . . ."); *see also* Art. I, § 22, Fla. Const. The trial court's role as gatekeeper "is not intended to supplant the adversary system or the role of the jury[.]" *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013); *see also United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996); *Baan v. Columbia County*, 180 So. 3d 1127, 1134 (Fla. 1st DCA 2015); *Vitiello*, 281 So. 3d at 560 (*Daubert* does not "serve as a replacement for the adversary system.").

Indeed, as *Daubert* itself cautions, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Royal Caribbean Cruises, Ltd.*, 320 So. 3d at 290 (quoting *Daubert*). "These tools remain the 'appropriate safeguards,' and not 'wholesale exclusion,' where the basis for expert testimony meets the standards set forth by the rules of evidence." *Vitiello*, 281 So. 3d at 560 (quoting *Daubert*, 509 U.S. at 596). As a result, exclusion of an expert's testimony is the exception—not the rule. *See Vitiello*, 281 So. 3d at 560; *see also Royal Caribbean Cruises, Ltd.*, 320 So. 3d at 291 (quoting *Vitiello*).

B.

1.

Here, Mrs. Lewis brought her FELA claim for the wrongful death of her husband. The U.S. Supreme Court has made clear that FELA is a "broad remedial statute." *Forcino v. Nat'l R.R. Passenger Corp.*, 671 So. 2d 888, 889 (Fla. 5th DCA 1996) (citing

*Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994)). "Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the human overhead of doing business from employees to their employers." *Gottshall*, 512 U.S. at 542 (internal quotation marks omitted) (quoting *Tiller v. Atl. Coast Line R.R. Co.,* 318 U.S. 54, 58 (1943)).

To that end, Congress provided that carriers by railroad are liable for injury or death "resulting in whole or in part from the negligence" of the carrier or its agents. 45 U.S.C. § 51. The employer is liable if its negligence "played any part, even the slightest, in producing the injury or death for which damages are sought." *Gottshall*, 512 U.S. at 543 (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957)).

2.

In support of her FELA claim, Mrs. Lewis designated Dr. Rosenfeld as her liability expert. In broad terms, he opined concerning Mr. Lewis's occupational exposure to diesel exhaust and benzene during his career and that Norfolk was negligent in several key areas, including its failure to provide a safe work environment and to warn its employees about the health risks associated with exposure to diesel exhaust and benzene.

Norfolk's objections to Dr. Rosenfeld's testimony—namely that Dr. Rosenfeld's testimony is inadmissible because: (i) his methodology in determining Mr. Lewis's exposure concerning levels is unreliable; and (ii) his methodology is not reliably applied to this case because his information and assessment tools are born of non-railyard, Superfund sites dealing with lung cancer and not chronic lymphocytic leukemia—do not warrant exclusion under *Daubert*. Certainly, these arguments are properly the subject of Norfolk's focused and energetic cross-examination of Dr. Rosenfeld. *See Holland v. Holland*, 360 So. 3d 1176, 1180 (Fla. 5th DCA 2023) (holding that claims deficiencies in the bases for the expert's opinion would be "proper fodder for an intense cross-examination" but did not warrant exclusion). And this cross-examination, together with the other tested and proven tools of "presentation of contrary evidence[] and careful instruction on the burden of proof," *see Daubert*, 509 U.S. at 596, provide sufficient

and "appropriate safeguards" inherent in our adversarial system to facilitate a jury's determination whether Norfolk's negligence "played any part, *even the slightest*, in producing" Mr. Lewis's death, *see Gottshall*, 512 U.S. at 543 (emphasis added).

Further, Dr. Rosenfeld is Mrs. Lewis's expert on *liability*—not medical causation. As a result, Norfolk's argument that the assessment tools and data he relied upon addressing lung cancer and not chronic lymphocytic leukemia does not render unreliable his opinion on liability. Whether such exposure was capable of or sufficient to cause Mr. Lewis's specific type of cancer is properly the focus the testimony and examination of Dr. Mark Levin, Mrs. Lewis's causation expert.

## III.

Accordingly, as the trial court erred in excluding the testimony of Dr. Rosenfeld, Mrs. Lewis's liability expert, and resultingly entering summary judgment in favor of Norfolk, we REVERSE the summary judgment and REMAND the case for further proceedings consistent with this opinion.

It is so ordered.

MAKAR and EISNAUGLE, JJ., concur.

––––––––––––––––––––––––––

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

––––––––––––––––––––––––––

10