# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 5D2024-1910
LT Case No. 2021-CA-000450

_____

GREGORY L. WILLIAMS, as
Successor Personal
Representative of the Estate of
Addilyn Leeann Shirer,

     Appellant,

     v.

LEESBURG REGIONAL MEDICAL
CENTER, INC. d/b/a CENTRAL
FLORIDA HEALTH n/k/a UF
HEALTH LEESBURG HOSPITAL,
PARAGON EMERGENCY SERVICES,
LLC, MARIANO DE LA MATA,
TINA BEST, and LORRAINE
CHMIELEWSKI,

     Appellees.

_____

On appeal from the Circuit Court for Lake County.
Danny Ray Mosley, Judge.

Wesley T. Straw, Matthew D. Emerson, and Nicole M. Ziegler, of
Emerson Straw, PL, St. Petersburg, and Adam Richardson, of
Burlington & Rockenbach, P.A., West Palm Beach, for Appellant.

Christina R. Davis, of Davis Appeals, PLLC., St. Petersburg, for
Appellee, Leesburg Regional Medical Center, Inc.

Jennifer L. Phillips, Thomas E. Dukes, III, and Wilbert R. Vancol, of McEwan, Martinez, Dukes, Hall, & Vancol, P.A., Orlando, for Appellees, Paragon Emergency Services, LLC, and Mariano De La Mata.

No Appearance for Remaining Appellees.

January 30, 2026

BLOCKER, ASSOCIATE J.

Appellant Gregory Williams, as successor personal representative to the Estate of Addilyn Leeann Shirer, seeks review of the trial court's exclusion of his causation experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), in a medical malpractice action. Appellant contends the trial court's reliance on deposition transcripts gives this Court de novo review, and that the trial court erroneously oversimplified the experts' opinions in excluding them. Because both contentions are incorrect, we affirm.

I.

Late morning on March 31, 2019, Christopher Shirer and Tabitha Ryan brought their two-month-old baby, A.S., to Appellee Leesburg Regional Medical Center ("Hospital"). She was pale and lethargic, having had a cough for several days. Her medical notes from Appellee Nurse Tina Best and a nurse practitioner not a party to this action indicated she was not in acute distress, was alert (although Nurse Best noted initially that she was difficult to arouse) and responsive, and had a regular respiratory pattern. Appellee Mariano de la Mata ("Doctor") found her lungs clear and ordered albuterol treatment. In administering the albuterol, Appellee Respiratory Therapist Lorraine Chmielewski noted that A.S. had normal breathing other than passing grunting and tachypnea (rapid breathing). Another nurse saw A.S. and noted the presence of "rhonchi"—a coarse breath sound and pertussis indicator. She was discharged that afternoon and directed to follow up with her primary care provider and return to the emergency room if symptoms worsened.

The next day, A.S. saw her primary care doctor with a worsened cough and decreased oxygen saturation, warranting an emergency transfer back to Hospital. She arrived at 12:04 pm and was in significant distress, with oxygen saturation at 78 percent and a respiratory rate of 62. Doctor found her tachypneic with mild tachycardia and called Hospital's pediatrician, who recommended that she be transferred to another hospital. Prior to her transfer, blood testing was performed, finding A.S. had an extremely elevated white blood cell count of 58,200. A.S. had not yet been vaccinated against pertussis (commonly known was whooping cough) because of her age.

Arriving at the second hospital—not named in this lawsuit—at approximately 6:12 p.m., A.S. was having coughing fits lasting several minutes and causing her to turn red. Her white blood cell count continued to increase, and rapid testing not available at Hospital resulted in a diagnosis of pertussis and rhino enterovirus. At that time, close to midnight, she was administered the antibiotic azithromycin without any improvement. Her white blood cell count rose to 81,000, she was intubated and put on a ventilator on April 4, 2019, and tragically passed away on April 6, 2019.

## II.

Appellant filed a complaint against Appellees for failing to timely diagnose and treat A.S., thereby causing her death. A plaintiff seeking to recover in a medical malpractice case such as this one must prove the standard of care each defendant owed the plaintiff, each defendant breached that standard, and the breach proximately caused the damages. *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984). To establish causation, "[t]he plaintiff must show that the injury more likely than not resulted from the defendant's negligence." *Id.* at 1020. Put differently, "the plaintiff must show that what was done or failed to be done probably would have affected the outcome." *Id.*; *accord Chaskes v. Gutierrez*, 116 So. 3d 479, 488 (Fla. 3d DCA 2013) (collecting cases following *Gooding* standard and finding no proximate causation where plaintiff had "no better than even chance" of surviving absent breach of standard of care).

At issue in this appeal are only the expert opinions related to causation, not the appropriate standard of care.[1] Appellant offered the expert testimony of Patricia Penkoske, M.D., and Harry Hull, M.D., which the trial court struck under *Daubert* and section 90.702, Florida Statutes (2023). The trial court found these experts did not meet the reliability threshold for admissibility because they did not rely on testing, peer review, potential error rate, or general acceptance. Appellant then offered a second set of experts, Jennifer Snow, M.D., and Ramzy Rimawi, M.D. In excluding these experts, the trial court provided the following explanation:

> The Court further find[s] Ramzy Rimawi, M.D., and Jennifer Snow, M.D., [sic] opinions concerning causation are inadmissible. The experts['] background, training and experience coupled with the various articles they had referenced in their deposition and reports do not satisfy the requirements of Florida Statutes, section 90.702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).
>
> There are no concrete facts to support their conclusions. *Daubert* requires scientific evidence "fit" the plaintiff's theory of causation. Reliance on various publications that early administration of antibiotics is recommended or preferred is not sufficient to render expert opinions as to causation in this case. To satisfy *Daubert*, an expert opinion must assist the trier of fact concerning specific facts in dispute. Here the issue is whether the delay of 12–24 hours to

---

1. To clarify, in this appeal, this Court is reviewing the opinions of the experts as to whether it is more likely than not that administering antibiotics either on March 31, 2019, when A.S. was first at Hospital, or on April 1, 2019, prior to her transfer to the second hospital, would have prevented her death. It does not consider any opinions regarding whether Appellees should have known to administer antibiotics at either point.

administer antibiotics more likely than not caused the death. The notion of early treatment is well within common knowledge that would be obvious to the average juror but has nothing to do with causation. There is no record evidence connecting the delay to the causation of the death. The Court finds their testimony not reliable. Therefore, their opinions as to causation shall not be permitted.

In that same order, the trial court granted summary judgment in favor of Appellees.

III.

This Court reviews exclusion of expert witnesses under *Daubert* and its statutory counterpart for abuse of discretion. *Lewis v. Norfolk S. Ry. Co.*, 420 So. 3d 1099, 1104 (Fla. 5th DCA), *reh'g denied* (Oct. 24, 2025); *see also Baan v. Columbia County*, 180 So. 3d 1127, 1131 (Fla. 1st DCA 2015) (noting standard of review is the same even where excluding an expert's testimony is "outcome determinative"). Although the inquiry is typically more involved, it is ultimately an evidentiary ruling like any other under Florida Statutes Chapter 90. *See generally Booker v. State*, 397 So. 2d 910, 914 (Fla. 1981) ("The trial judge enjoys wide discretion in areas concerning the admission of evidence. His ruling on the admissibility of evidence will not be disturbed unless an abuse of discretion is shown."); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997) ("[A]buse of discretion is the proper standard of review of a [trial] court's evidentiary rulings."). So long as the trial court conducted a proper *Daubert* analysis, this Court is confined to abuse of discretion review. "Such discretion is limited by the rules of evidence, and a trial court abuses its discretion if its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Sanchez v. Cinque*, 238 So. 3d 817, 822 (Fla. 4th DCA 2018) (quoting *Patrick v. State*, 104 So. 3d 1046, 1056 (Fla. 2012)). Under the deferential abuse of discretion standard, an appellate court will not reverse "unless the trial court makes a ruling [with] which no reasonable judge would agree." *Miller v. State*, 379 So. 3d 1109, 1128 (Fla. 2024) (quoting *Wells v. State*, 364 So. 3d 1005, 1013 (Fla. 2023));

5

*see also Fertil v. Univ. of Miami*, 388 So. 3d 174, 176 (Fla. 3d DCA 2023) ("[W]e will reverse a trial court's striking of an expert witness only if we can find that no other reasonable judge would have taken the view adopted by the trial court.").

Plaintiff suggests that because the trial court did not conduct a "live" hearing—relying instead on deposition transcripts, medical literature, and other documents—this Court should give less deference. Plaintiff's cited cases are inapposite. *See Jacob v. Henderson*, 840 So. 2d 1167, 1168–69 (Fla. 2d DCA 2003) ("While we apply the abuse of discretion standard, case law has narrowed a trial court's discretion in cases involving dismissal for fraud. . . . A more stringent abuse of discretion standard is appropriate because dismissal is an extreme remedy." (internal citations omitted))[2]; *InPhyNet Contracting Servs., Inc. v. Soria*, 33 So. 3d 766 (Fla. 4th DCA 2010) (explaining, in class action certification, appellate court gives trial court's factual determinations less deference where issues of fact were decided without an evidentiary hearing); *Littles v. State*, 354 So. 3d 1169, 1171 (Fla. 5th DCA 2023) (stating appellate court gives less deference to trial court's factual findings based on video evidence); *Morris v. Muniz*, 252 So. 3d 1143, 1154–55 (Fla. 2018) (examining de novo whether an expert's unrefuted qualifications met the requirements of section 766.102, Florida Statutes). This appeal does not rest on a factual dispute of statements, qualifications of the experts, or the underlying facts of the case. It rests on the trial court's application of the *Daubert* standard to the expert opinions presented in relation to the central of the case: causation. The appropriate standard of review is abuse of discretion.

---

2. In *Jacob*, the court also cited *Hervey v. Alfonso*, 650 So. 2d 644 (Fla. 2d DCA 1995), for the proposition that less deference applies when the trial court reviewed the same materials the appellate court is reviewing. *Id.* at 1170. But the *Hervey* court was reviewing a summary judgment entered under the old summary judgment rule, which, in any event, was subject to de novo review.

IV.

Upon a proper challenge to expert testimony, its proponent bears the burden of establishing admissibility. *Lewis*, 420 So. 3d at 1104. Section 90.702, Florida Statutes, codifying *Daubert*, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principles and methods; and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

In assessing a challenge under the statute, the trial court must first determine whether an individual qualifies as an expert for the purposes of giving opinion testimony. By its plain language, an expert may be qualified based on "knowledge, skill, experience, training, or education." *Id.* While "'an expert may be qualified by experience,' it does not follow 'that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express." *Baan*, 180 So. 3d at 1133 (quoting *United States v. Frazier*, 387 F.3d 1244, 1266 (11th Cir. 2004)). The expert "must explain the logic and relevance of the expert opinion." *Id.*

An expert opinion that is both reliable and relevant is admissible. *Lewis*, 420 So. 3d at 1104. Reliability is determined by examining the expert's underlying methodology rather than his or her ultimate opinion; the analysis is a flexible one based on non-exhaustive factors like whether the methodology has the potential for or has been subjected to testing, has been subject to peer review

and publication, has a potential rate of error, or is generally accepted. *Id.* at 1105. Testimony is relevant if it assists the trier of fact in understanding evidence or determining a fact at issue. *Id.* In other words, "testimony must be 'tied to the facts of the case [so] that it will aid the jury in resolving a factual dispute.'" *Id.* (alteration in original) (quoting *Vitiello v. State*, 281 So. 3d 554, 560 (Fla. 5th DCA 2019)).

In conducting this significant analysis, a trial court's gatekeeping role requires a careful balance. On one hand, it must ensure expert testimony "employs in the court room the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 1104 (quoting *Cristin v. Everglades Corr. Inst.*, 310 So. 3d 951, 955–56 (Fla. 1st DCA 2020)). On the other, it must allow the adversarial system to address any shakiness in otherwise admissible testimony. *See id.* at 1104–05. Exclusion of the testimony is the exception rather than the rule. *Id.* at 1105. Nothing prevents a trial court, however, from excluding expert testimony when "there is simply too great an analytical gap between the data and the opinion proffered." *Kemp v. State*, 280 So. 3d 81, 89 (Fla. 4th DCA 2019) (quoting *Joiner*, 522 U.S. at 146).

V.

Understanding the progression of pertussis is critical to an evaluation of the admissibility of the medical testimony proffered in this case:

> Whooping cough, or pertussis, is caused by the Bordetella pertussis bacteria. It is one of the most contagious diseases known to man, with virtually 100% of susceptible children who are exposed to the disease becoming infected. The risk of disease is significant for children less than five years, with death rates highest in infants. The disease occurs year round, and females are more susceptible than males.
>
> Pertussis occurs in three stages. The catarrhal stage is like an upper respiratory infection and lasts one to two weeks. The

8

paroxysmal stage starts when the child begins to have spells of coughing. During this stage, which lasts two to four weeks or longer, the coughing spells become longer and the coughs themselves stronger. The spells consist of five to ten strong coughs during one expiration, followed by an enormous inspiration during which a "whoop" sound is heard. The episodes, which are extremely tiring, are the body's attempts to remove mucous plugs blocking an airway. They may also be associated with bulging of the eyes and neck veins and crying, all of which reflect the forcefulness of the coughs. The patients look comfortable between episodes. During the convalescent stage, the coughing spells begin to decrease, although the cough itself often stays.

Pertussis is easily diagnosed clinically during the paroxysmal stage. The diagnosis can also be confirmed by antibody titers. If the disease is suspected during the catarrhal stage and the throat culture, the Bordetella pertussis bacteria may be isolated. During the later stages, the bacteria is no longer present. The symptoms presented at these stages are due to damage to the respiratory tract caused by the infection.

§ 54:44. Whooping cough (pertussis)—Generally, 6 *Attorney's Medical Advisor* § 54:44 (footnotes omitted).

As noted above, Appellant finds error in the trial court's exclusion of four experts sought to be introduced to establish that a delay in administering antibiotics of up to a possible 36 hours caused A.S.'s death. His first expert, Dr. Penkoske, treated for pertussis—at most—one or two infants who were less than three months old, as she is primarily a heart surgeon and pediatric critical care doctor. Her opinion was that A.S. was in the second or paroxysmal stage of pertussis on both March 31 and April 1, 2019, because of her coughing symptom. She indicated that

although a white blood cell count was not determined, it would have been elevated. Dr. Penkoske testified A.S. died because she was already in the full-blown disease, and she felt strongly that if she had gotten the antibiotics 24 hours earlier, she would not have died. She testified, "At what time does the door close? All I know is that it was closed when she got the antibiotics and that before that, you know, when you look statistically at the number of babies that get pertussis, the majority of them don't die." Dr. Penkoske later repeated that all she can say is A.S. would not have died if she had gotten the antibiotics earlier—but how much earlier—she could not determine. Dr. Penkoske's opinion is not based on sufficient facts or data or produced using a reliable methodology. Thus, it was not error for the trial court to exclude it.

Next was Dr. Hull, who has worked as an epidemiologist consultant since 2007. He practiced pediatric medicine for about a year in 1990, and was board certified in pediatrics in 1979. Dr. Hull had not practiced medicine clinically since 2007. He believed that A.S. was in the first or catarrhal state of pertussis on March 31, 2019, although he explained the stages can overlap in younger children. He based his opinion on what stage A.S. was in when she had a cough and stuffy nose but no fever. In his opinion, once pertussis is established in the paroxysmal stage, antibiotic treatment will not affect the course of the disease. This is because antibiotics kill the bacteria but not the toxins they produce. Dr. Hull echoed Dr. Penkoske's opinion that A.S.'s white blood cell count would have been extremely elevated on the first day she presented at Hospital, and higher white blood cell counts are associated with infant deaths from pertussis. In Dr. Hull's opinion, A.S. would have survived if she had been given antibiotics on the afternoon of March 31, 2019. Similar to Dr. Penkoske, when asked if antibiotics would more likely than not have made a difference the next day, Dr. Hull explained that the antibiotics did not make a difference at the time they were given and, as with any infectious disease, the longer treatment is delayed, the more likely there will be severe complications. Dr. Hull could only say that A.S. was in full paroxysmal stage when she arrived at the second hospital because she had posttussive emesis (vomiting after coughing), and her cough got much more severe. He could not say when the transition to the second phase occurred. It was not error for the trial court to exclude Dr. Hull's opinion for the same reason

as Dr. Penkoske—he could not provide a scientifically reliable basis for his opinion that A.S. would probably have survived if she had received antibiotics during her first visit to Hospital on March 31 as opposed to when the medicine was administered on April 1.

Third was Dr. Snow. She is board certified in pediatric critical care medicine and general pediatrics and has treated eight to ten infants suffering with pertussis in her eighteen years as a physician, four of whom were under three months old, and only one who died. She cited medical literature that concluded antibiotics only limit the severity of pertussis if given in the catarrhal stage. She did not have any medical literature determining the significance of a 24-hour delay in antibiotic administration on the last day of the catarrhal phase. Dr. Snow found literature indicating the majority of infants with a white blood cell count above 46,000 died, as well as 90 percent of those with counts above 70,000. She testified that administration of antibiotics will eliminate the pertussis bacteria in the airways of vaccinated adults within 48 hours. Because death is tied to the presence of toxins released by the pertussis bacteria, the earlier the antibiotics are administered, the more likely they are to kill the bacteria before they can produce enough toxins and have an impact on the outcome. Dr. Snow's opinion echoed Dr. Hull as to what stage A.S. was in—the first on March 31, 2019, and the second on April 1, 2019. While Dr. Snow perhaps could have been cross-examined on the applicability of the cited studies on vaccinated adults to that of unvaccinated infants, the greater deficiency is that her opinion would not assist the jury in determining whether A.S. more likely than not would have survived if she had been given antibiotics on what Dr. Snow opined was the last day of the catarrhal stage of pertussis. She explained there were no studies on the impact of the antibiotics on the toxins that ultimately cause death. The trial court did not err in finding that Dr. Snow failed to reliably apply her principles and methods to the facts of the case in a manner that would assist the jury. *See* § 90.702(3), Fla. Stat.

The final expert presented was Dr. Rimawi. He is board certified in infectious disease and critical care medicine. He has treated roughly thirty pediatric patients with pertussis on an outpatient basis, with three to four fewer than six months old (although he admitted that he did not know when he was treating

11

them that they had pertussis). Dr. Rimawi also believed A.S. was in the last day of the catarrhal stage of pertussis on March 31, 2019. He has published articles related to sepsis, treated patients for sepsis, and primarily based his opinion on medical literature related to sepsis. Dr. Rimawi believed A.S. had sepsis as of around 1:00 p.m. on March 31, 2019, because of her elevated heart and respiratory rates. He opined that if she had been given antibiotics, it would have increased her chances of survival, but the window to do so after sepsis was three hours. Dr. Rimawi explained that, while he did not know the efficacy of antibiotics based on a particular day in the progression of the disease, he echoed the testimony of the other experts that "in general earlier is better." If given any earlier on April 1, 2019, Dr. Rimawi could only say survival was possible. The trial court did not err in excluding his opinion either.

VI.

Overall, Appellant argues that the trial court improperly conflated the number of hours that passed without treatment (which he contends is not relevant) with the stage of progression A.S. was in (which he contends is). The two concepts, however, are intertwined. Depending on each expert's opinion about what stage A.S. was in at Hospital, and at what stage antibiotics would no longer affect the disease, the factfinder would have to apply the stage to the time frame to determine whether, more likely than not, if A.S. had received antibiotics at that time and in that stage of pertussis, she would have survived. While Appellant is correct that an expert does not have to establish causation conclusively to be admissible, a reasonable judge could conclude, as this one did, that the expert testimony proffered was not sufficiently reliable (Drs. Penkoske and Hull) and/or would not assist the jury (Drs. Snow and Rimawi) in determining whether a delay in antibiotics more likely than not caused A.S.'s untimely death. Accordingly, the trial court did not abuse its discretion in excluding any of Appellant's experts.

AFFIRMED.

HARRIS and SOUD, JJ., concur.

12

---

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

---